UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| CHARLES OUELLETTE et al., | ) | |
|---|---|---|
| | ) | |
| Plaintiffs | ) | Civil No. 1:13-CV-00347-NT |
| v. | ) | |
| | ) | |
| JANET MILLS et al., | ) | |
| Defendants | ) | |

**ORDER ON MOTION TO DISMISS**

In this case, the Plaintiffs challenge the validity of certain 2013 amendments to the Maine Pharmacy Act (the "**MPA**"), 32 M.R.S. §§ 13701-13810. Before the Court is a motion brought by Defendants Janet Mills and H. Sawin Millett, Jr. (together, the "**State**") to dismiss the complaint (ECF No. 17) pursuant to Federal Rule of Civil Procedure 12(b)(1) on the basis that the Plaintiffs lack standing to assert their claims. The State also requests dismissal of the claims against H. Sawin Millett, Jr. pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state claims for which relief can be granted. For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

BACKGROUND

The MPA generally requires persons who "engage in the practice of pharmacy" to be licensed. 32 M.R.S. § 13731(1). On June 27, 2013, Maine's legislature approved, without the Governor's signature, "An Act To Facilitate the Personal Importation of Prescription Drugs from International Mail Order Prescription Pharmacies." 2013

1

Me. Legis. Serv. Ch. 373 (S.P. 60) (L.D. 171) (West) (effective October 9, 2013) (the "**2013 Act**"). The 2013 Act amended the MPA by adding the following provisions:

> **B.** A licensed retail pharmacy that is located in Canada, the United Kingdom of Great Britain and Northern Ireland, the Commonwealth of Australia or New Zealand that meets its country's statutory and regulatory requirements may export prescription drugs by mail or carrier to a resident of this State for that resident's personal use. A licensed retail pharmacy described in this paragraph is exempt from licensure under this Act; and
>
> **C.** An entity that contracts to provide or facilitate the exportation of prescription drugs from a licensed retail pharmacy described in paragraph B may provide or facilitate the provision of prescription drugs from that pharmacy by mail or carrier to a resident of this State for that resident's personal use. An entity that provides or facilitates the provision of prescription drugs pursuant to this paragraph is exempt from licensure under this Act.

*Id.* (codified at 32 M.R.S. § 13731(1)(B), (C)). The 2013 Act also included a new provision, "Consumer Choice Preserved," which states:

> Nothing in this chapter may be construed to prohibit:
>
> 1. **Ordering or receiving prescription drugs.** An individual who is a resident of the State from ordering or receiving prescription drugs for that individual's personal use from outside the United States by mail or carrier from a licensed retail pharmacy described in section 13731, subsection 1, paragraph B or an entity described in section 13731, subsection 1, paragraph C; or
>
> 2. **Dispensing or providing prescription drugs.** A licensed retail pharmacy described in section 13731, subsection 1, paragraph B or an entity described in section 13731, subsection 1, paragraph C from dispensing, providing or facilitating the provision of prescription drugs from outside the United States by mail or carrier to a resident of the State for that resident's personal use.

*Id.* (codified at 32 M.R.S. § 13799).

By complaint dated September 10, 2013, (the "**Complaint**") the Plaintiffs—two Maine pharmacists, trade organizations[1] representing the interests of Maine pharmacists (the "**Trade Associations**"), and the Pharmaceutical Research and Manufacturers of America ("**PhRMA**")—brought suit against the State, requesting a declaration that the 2013 Act is preempted by the federal Food, Drug, and Cosmetics Act (the "**FDCA**"), 21 U.S.C. §§ 301-399f, and the Constitution's Foreign Commerce Clause, U.S. Const. art. I, § 8 cl. 3, and requesting an injunction prohibiting the State and its officials from implementing the 2013 Act.

The Complaint alleges that in 2012, the State of Maine adopted the "MaineMeds" program, which allowed insured state employees to purchase prescription medications from foreign pharmacies through CanaRx, a Canadian mail-order pharmacy. Compl. ¶ 42. The Maine Board of Pharmacy contacted the Maine Attorney General's office for an opinion regarding the legality of the MaineMeds program, and the AG's office advised that CanaRx's participation in the program constituted the unlicensed practice of pharmacy, and that state law prohibited the Board from licensing any foreign pharmacy. Compl. ¶ 43. CanaRx thereafter terminated the MaineMeds program as well as the "PortlandMeds" program operated by the City of Portland, and the "HardwoodMeds" program operated by Hardwood Products Company, a Maine employer. Compl. ¶ 44.

Following this, Maine enacted the 2013 Act. The Complaint alleges that the sponsors of the 2013 Act justified the new law "on a cost-savings rationale,"—i.e., that

---

[1] These are the Maine Pharmacy Association, the Maine Society of Health-System Pharmacists, and the Retail Association of Maine.

prescription drugs from foreign pharmacies cost less than their domestic counterparts—and that the law "will cause a transfer of market share" away from Maine pharmacies and to foreign mail-order pharmacies. Compl. ¶ 64. The Complaint alleges that Millett, Maine's Commissioner of the Department of Administrative and Financial Services, "oversees the provision of health insurance benefits to state employees and their families" and, thus, "will be responsible for implementing any state-run program to import pharmaceuticals. . . ." Compl. ¶ 13.

In this motion to dismiss, the State contends that the Plaintiffs lack both constitutional and prudential standing to challenge the 2013 Act, and that in any event all claims against Millett should be dismissed for failure to state claims for which relief may be granted.

**LEGAL STANDARD**

On a motion to dismiss for lack of standing, the Court accepts as true all material allegations in the complaint and construes them in the plaintiff's favor. *See Blum v. Holder*, 744 F.3d 790, 795 (1st Cir. 2014); *Katz v. Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012). The plaintiff bears the burden of alleging facts " 'demonstrating that he is a proper party to invoke' federal jurisdiction." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). "The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." *Katz*, 672 F.3d at 71.

**DISCUSSION**

The Plaintiffs assert that the 2013 Act impermissibly intrudes on both: (1) the federal government's plenary power to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8 cl. 3 (the "**Foreign Commerce Clause**"); and (2) the FDCA's prohibition against importation of foreign pharmaceuticals, which, as a federal statute, is "the supreme Law of the Land . . . ." U.S. Const. art. VI, cl. 2 (the "**Supremacy Clause**").

Every plaintiff must establish that she has standing to bring her claims. *Katz*, 672 F.3d at 71. Article III of the United States Constitution limits the federal courts' adjudicative power to "Cases" and "Controversies." *Blum*, 744 F.3d at 795. This limitation "requires federal courts to satisfy themselves that 'the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of federal-court jurisdiction.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth*, 422 U.S. at 498-99). To establish Article III standing, a plaintiff "bears the burden of demonstrating that (i) she has suffered an actual or threatened injury in fact, which is (ii) fairly traceable to the statute, and (iii) can be redressed by a favorable decision." *Ramírez v. Sánchez Ramos*, 438 F.3d 92, 97 (1st Cir. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Standing also has prudential dimensions that "ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked." *Pagán v. Calderón*, 448 F.3d 16,

27 (1st Cir. 2006). "Although the prudential requirements may be relaxed in some contexts, 'the constitutional requirements apply with equal force in every case.'" *Katz*, 672 F.3d at 72 (quoting *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 46 (1st Cir. 2011)).

### A. Constitutional Standing – Whether the Plaintiffs Have Alleged an Injury in Fact

The State concentrates its arguments on the "injury in fact" prong of Article III standing, focusing on: (1) the Plaintiffs' failure to show that any alleged future injury is "certainly impending," *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013); and (2) the difficulty of challenging a law that "neither require[s] nor forbid[s] any action" by the plaintiff. *Summers*, 555 U.S. at 493; *see also Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.") (internal citations and quotation marks omitted). The Court first analyzes these issues with respect to the Maine pharmacists and Trade Associations, and then with respect to PhRMA, which represents the interests of companies that produce brand-name prescription drugs. Compl. ¶ 11.

1. **Certainly Impending Harm**

   a. **Pharmacists and Trade Associations[2]**

---

[2] The State does not dispute that, if the Maine pharmacists have standing, the Trade Associations meet the test for standing articulated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977). Under the *Hunt* test,

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

6

The theory of harm articulated by the Maine pharmacists—loss of market share—is generally sufficient to confer standing. *See Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993) ("[G]overnment action that removes or eases only the competitive burdens on the plaintiff's *rivals* plainly disadvantages the plaintiff's competitive position in the relevant marketplace."). The State claims, however, that the pharmacists' potential loss of market share is not sufficiently imminent or concrete to establish standing. The Court disagrees. As alleged in the Complaint, Maine law prior to the 2013 Act prohibited foreign pharmacies from selling prescription drugs within the state. At least three programs supplying prescription medications to Maine citizens through a foreign supplier were terminated in the wake of the Attorney General's 2012 opinion regarding their illegality. It is not speculative to conclude that the 2013 Act would cause these programs to reopen and thereby cause Maine pharmacists to lose market share to these revitalized competitors. The pharmacists have plausibly alleged a "certainly impending" loss of market share as a result of the 2013 Act.

b. **PhRMA**

The State also claims that PhRMA has failed to allege any concrete, non-speculative claims of injury. PhRMA responds that, as a result of the 2013 Act, mislabeled, adulterated, counterfeit, or expired drugs from foreign sources may enter

---

asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt*, 432 U.S. at 343.

7

Maine and cause patient injury, giving rise to reputational damage to companies whose names are associated with these drugs. PhRMA claims that this harm is sufficiently concrete because the FDA has voiced concerns about CanaRx, which participated in several Maine-based prescription drug importation programs, and because there has already been widespread international counterfeiting of the cancer drug Avastin. Opp'n to Mot. to Dismiss 15 (ECF No. 22); Compl. ¶¶ 20-29.

The Complaint alleges no injuries to anyone in Maine as a result of the past importation of pharmaceuticals into the state, and it fails to identify any specific injuries to Maine consumers that are expected to arise out of any new importations. The prospect of injury to PhRMA or its members is further attenuated because nothing in the Complaint supports a plausible inference that blame for any harm that arises out of the importation of prescription drugs would be laid at any PhRMA member's doorstep. Although the Complaint alleges that the FDA found that CanaRx shipped insulin in a manner "which could potentially compromise the safety and effectiveness of the insulin," Compl. ¶ 27, it does not allege that the insulin allegedly mishandled by CanaRx is linked to any of PhRMA's members, much less that CanaRx's mishandling has led or will certainly lead to any reputational damage to these members. The Complaint also fails to tie CanaRx or any other entities exempted under the 2013 Act to participation in the Avastin counterfeiting scheme. Thus, PhRMA's claims rest on a "chain of contingencies" that amount to "mere speculation" that it and its member companies *may* suffer reputational injuries arising out of physical injuries to Maine consumers who, following the 2013 Act, *may* be injured by

unsafe foreign drugs associated with PhRMA member companies. *See Clapper*, 133 S.Ct. at 1148.[3]

PhRMA also claims that the 2013 Act "dilutes PhRMA's members' statutory right" under 21 U.S.C. § 381(d)(1). Opp'n to Mot. to Dismiss 15. Section 381(d)(1) prohibits re-importation of U.S.-manufactured prescription drugs from abroad, except by the manufacturer of the drug itself. But PhRMA fails to explain how dilution of this provision might give rise to a concrete harm to PhRMA or its members. PhRMA does not claim, for example, that re-importation of PhRMA members' drugs by entities other than PhRMA members will result in lower profits for these pharmaceutical companies. PhRMA also concedes that the purpose of Section 381(d)(1) is to ameliorate a risk of harm to the public from sub-potent or adulterated drugs. Opp'n to Mot. to Dismiss 15. But PhRMA has no standing to assert harm to the public arising out of the 2013 Act's dilution of Section 381(d)(1). *See Lujan*, 504 U.S. at 573 (plaintiff "claiming only harm to his and every citizen's interest in proper

---

[3] PhRMA also claims standing on the basis that the 2013 Act has frustrated its mission and diverted its resources. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If, as broadly alleged, [the defendant apartment complex owner's racially discriminatory] steering practices have perceptibly impaired [the plaintiff equal-opportunity housing organization's] ability to provide counseling and referral services for low and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.") But in *Havens*, the harm was already occurring when the suit was filed. *See id.* Here, the Complaint contains no allegations that PhRMA's resources have been diverted to combat an already-occurring harm. Rather, PhRMA has allegedly expended its resources to educate the public about the dangers of drug importation in an attempt to head off possible future reputational injuries feared by its members. In this, PhRMA's expenditures resemble the plaintiffs' expenditures in *Clapper*. There, the Supreme Court observed, "[r]espondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending." *Clapper*, 133 S.Ct. at 1151.

application of the Constitution and laws . . . does not state an Article III case or controversy.")[4]

Because PhRMA has failed to articulate a concrete and particularized, certainly impending harm arising out of the 2013 Act, it has no standing and must be dismissed from this suit.[5]

## 2. Standing to Challenge a Statute that Neither Requires nor Forbids Any Action by the Pharmacists or Related Organizations

The 2013 Act exempts from regulation certain foreign pharmacies and their contractors from the MPA's licensing requirements. This removes Maine law as a barrier to the importation of prescription drugs into Maine by certain foreign pharmacies and contractors. This has no direct application to Maine pharmacists or associated trade organizations. As the Supreme Court explained in *Lujan*, when a plaintiff's injury arises out of the "allegedly unlawful regulation (or lack of regulation) of *someone else*, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction." *Lujan*, 504 U.S. at 562 (emphasis in original). In such cases, the plaintiff's standing

---

[4] Congress chose not to provide PhRMA members with redress for any dilution of Section 381(d)(1). "The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with the FDCA's requirements. *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 349 (2001) (citing 21 U.S.C. § 337(a), which states that "all such proceedings for the enforcement, or to restrain violations, of this chapter [the FDCA] shall be by and in the name of the United States.").

[5] The First Circuit has observed that, "[w]here coplaintiffs have a shared stake in the litigation—close identity of interests and a joint objective—the finding that one has standing to sue renders it superfluous to adjudicate the other plaintiffs' standing." *Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, 976 (1st Cir. 1989), *see also Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999) ("It is a settled principle that when one of several co-parties (all of whom make similar arguments) has standing, an appellate court need not verify the independent standing of the others.") This rule does not actually confer standing on a party that lacks standing, but merely excuses an inquiry into standing that would make little practical difference to the case. In this case, the Court has inquired and finds that PhRMA lacks standing.

"'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict.'" *Id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)).

The Court can presume that the 2013 Act will cause the resumption of prescription drug importation programs in Maine. Indeed this was the acknowledged aim of the legislation. This will impact Maine pharmacists by causing them to lose market share. The situation might be different if the FDA had a history of taking action against pharmacies that imported drugs to Maine consumers. But the Complaint lists no enforcement actions, only letters, reports, and testimony detailing the FDA's concerns with the importation of prescription drugs from foreign pharmacies. Compl. ¶¶ 20-27. In the absence of any history of FDA enforcement, the Court can conclude that the 2013 Act will cause the predicted loss of market share.

The 2013 Act has been in effect since shortly after the Complaint was filed. If the 2013 Act has not resulted in the resumption of prescription drug importation programs, the State may raise the issue of the Plaintiffs' standing again at summary judgment. *See Lujan*, 504 U.S. at 561 (Article III standing requirements are "an indispensable part of the plaintiff's case" and thus plaintiffs are required to support standing at every stage of litigation "with the manner and degree of evidence required at the successive stages of the litigation").

### B. Prudential Standing

The State claims that the Plaintiffs lack prudential standing because they are not within the "zone of interests" protected by the FDCA or the Foreign Commerce Clause. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (in addition to sustaining an injury in fact, the interest the plaintiff seeks to protect must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question"). Because the Court has already concluded that PhRMA lacks constitutional standing, the prudential limits are considered only with respect to the individual pharmacists and the Trade Associations.

#### 1. Prudential Standing Under the FDCA / Supremacy Clause

Under the Supremacy Clause, the Constitution and the laws of the United States are "the supreme Law of the Land." U.S. Const. Art. VI, cl. 2. Federal law thus preempts conflicting state law. *See Gade v. Nat'l Solid Wastes Mgm't Ass'n*, 505 U.S. 88, 108 (1992) ("[U]nder the Supremacy Clause, from which our preemption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'") (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). The Plaintiffs allege that the FDCA prohibits the importation of prescription drugs and that the 2013 Act allows the importation of prescription drugs in violation of the FDCA and the Supremacy Clause.

The FDCA's prohibitions on the importation of prescription drugs are concerned with public health and safety. *See* 21 U.S.C. § 384.[6] The State argues that the Maine pharmacists and the Trade Associations do not fall within the zone of interest of the FDCA.

This argument has been foreclosed by the First Circuit. *See Pharm. Research and Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001) *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003). In *Concannon*, the plaintiff (which happened to be PhRMA), sued the defendant (which happened to be the State of Maine), arguing that a recently-enacted Maine statute (the "**Maine Rx Program**") was preempted by a Medicaid statute. The Maine Rx Program required pharmaceutical companies to participate in a drug price rebate program or else have their pharmaceuticals subjected to prior authorization requirements under the State Medicaid program. 22 M.R.S. § 2681(7-A). PhRMA argued that this conflicted with a federal Medicaid statute addressing prior authorization requirements. The State countered that PhRMA lacked prudential standing to challenge the Maine Rx Program because PhRMA was not within the zone of interests protected by the federal Medicaid statute. The First Circuit rejected this argument, holding:

> PhRMA has not asserted an action to enforce rights under the Medicaid statute, however, but rather a preemption-based challenge under the Supremacy Clause. In this type of action, it is the interests protected by

---

[6] Section 384 governs the importation of prescription drugs into the United States. It notes, *inter alia*, that importation of prescription drugs will only be allowed under regulations that "ensure that each prescription drug imported [is] . . . safe and effective for the intended use of the prescription drug," 21 U.S.C. § 384(c)(1); that any drug importer must certify that any imported prescription drug is "not adulterated or misbranded" and that it "meets all labeling requirements" for domestic drugs, 21 U.S.C. § 384(d)(1)(K); and that enforcement of the prohibition on importation of prescription drugs should focus "on cases in which the importation by an individual poses a significant threat to public health." 21 U.S.C. § 384(j)(1).

> the Supremacy Clause, not by the preempting statute, that are at issue. . . . Where a party has established a concrete injury in fact, and otherwise has standing to challenge the lawfulness of the statute, it is "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should [its] constitutional challenge fail and the statute [ ] remain in force." *Craig v. Boren,* 429 U.S. 190, 195 (1976) (quoting *Griswold v. Connecticut,* 381 U.S. 479, 481 (1965)).

*Concannon*, 249 F.3d at 73-74 (some internal citations omitted). Thus, the Maine pharmacists and their related trade organizations, which have alleged a concrete injury in fact, *see* discussion above Part A.1, are entitled under the Supremacy Clause to argue that the FDCA preempts the 2013 Act.

In light of *Concannon*, the Court must decline the State's invitation to adopt the rule articulated by Justice Roberts in a four-member dissent in *Douglas v. Independent Living Center of Southern California, Inc.*, 132 S.Ct. 1204 (2012). There, Justice Roberts posited that the Supremacy Clause does not create a cause of action where "there is no such right under the pertinent statute itself . . . ." *Douglas*, 132 S. Ct. at 1213.

### 2. Prudential Standing Under the Foreign Commerce Clause

Under the Foreign Commerce Clause, Congress has the power to "regulate Commerce with foreign Nations. . . ." U.S. Const. art. I, sec. 8, cl. 3. The State argues that the Plaintiffs' claims do not fall within the zone of interests protected by the Foreign Commerce Clause because that clause is concerned only with state laws that discriminate against foreign commerce, not those, like the 2013 Act, that encourage foreign commerce.

14

The State's interpretation of the Foreign Commerce Clause is too cramped. The Foreign Commerce Clause protects the federal government's ability to speak with one voice in matters of commerce with foreign nations. *See Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 449 (1979). The need for federal uniformity reaches both protectionist acts by states as well as acts that, in favoring foreign commerce, tread on the federal government's domain. *See Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 57 (1933)).

But this does not mean that the Maine pharmacists and Trade Associations fall within the zone of interests the Foreign Commerce Clause seeks to protect. In *Board of Trustees*, the plaintiff was a state university attempting to avoid payment of a federal tariff on scientific equipment it imported. *Bd. of Trs.*, 289 U.S. at 56. The Supreme Court upheld the federal tax as a proper exercise of Congress's affirmative powers under the Foreign Commerce Clause. *Id.* at 59. In the cases cited by the parties where the Foreign Commerce Clause was applied to strike down a state law, the considerations were prevention of international disputes or foreign retaliation over apportionment of taxes. *See, e.g.*, *Kraft Gen. Foods, Inc. v. Iowa Dept. of Rev. and Fin.*, 505 U.S. 71, 79 (1992); *Japan Line*, 441 U.S. at 450. The plaintiffs in those cases were international corporations. The Plaintiffs have not identified any Foreign Commerce Clause case where the plaintiffs were United States citizens and the object of their complaint was a state law.[7] The interest of certain Maine citizens in striking

---

[7] *Concannon* holds that a plaintiff with Article III standing who asserts a preemption challenge based on the Supremacy Clause either always meets prudential standing requirements or need not meet those requirements at all. *See Concannon*, 249 F.3d at 73. The Plaintiffs do not assert that

15

down a Maine law which addresses foreign trade does not logically fit within the zone of any interest the Foreign Commerce Clause seeks to protect. *See id.*

Accordingly, the Court declines for prudential reasons to adjudicate the Plaintiffs' Foreign Commerce Clause claims, and dismisses Count II of the Complaint.

### C. Claims Against Commissioner Millett

The State requests that claims against Commissioner Millett be dismissed because the suit is about the legality of the 2013 Act, and Millett has no responsibility for enforcing or overseeing the Act. But the Plaintiffs allege that Millett "oversees the provision of health insurance benefits to state employees and their families" and, thus, "will be responsible for implementing any state-run program to import pharmaceuticals." Compl. ¶ 13. This may include a revived form of the MaineMeds program described in the Complaint. The Complaint requests, in part, injunctive relief prohibiting the State from facilitating the importation of pharmaceuticals. It is at least plausible that this requested relief, if appropriate, will encompass Millett's actions. Accordingly, the Court denies the State's motion to dismiss with respect to the claims against Commissioner Millett.

## CONCLUSION

For the above-stated reasons, the Defendants' motion to dismiss is **GRANTED** as to PhRMA and as to Count II of the Complaint. Count II of the Complaint is hereby

---

*Concannon* should apply to claims that seek to strike state laws based on their conflict with the Foreign Commerce Clause.

**DISMISSED**, and PhRMA is hereby **DISMISSED** from this suit. The Defendants' motion is **DENIED** in all other respects.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this     day of  May, 2014.